**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

STEVE RAY EVANS,

    Plaintiff - Appellant,

v.

SANDY CITY, a municipal corporation;
TIM DOLAN, Mayor of Sandy City;
KEVIN THACKER, Sandy City Police
Chief; ROBERT WALL, Sandy City
Attorney; DOUGLAS JOHNSON, Sandy
City Prosecutor; R. MACKAY HANKS,
Sandy City Prosecutor; SCOTT
COWDELL, Sandy City Council Member;
MAREN BARKER, Sandy City Council
Member; KRISTIN COLEMAN-
NICHOLL, Sandy City Council Member;
CHRIS MCCANDLESS, Sandy City
Council Member; STEVE FAIRBANKS,
Sandy City Council Member; LINDA
MARTINEZ SAVILLE, Sandy City
Council Member; STEPHEN P. SMITH,
Sandy City Council Member; C. TYSON,
Sandy City Police Department; C.
PINGREE, Sandy City Police Department;
J. E. BURNS, Sandy City Police
Department; JOHN DOE I-XX, Sandy City
Police Department,

    Defendants - Appellees.

No. 17-4179
(D.C. No. 2:17-CV-00408-BSJ)
(D. Utah)

_____

**ORDER**
_____

Before **BRISCOE**, **BALDOCK**, and **EID**, Circuit Judges.

_____

This matter is before the court on the appellant's *Petition for Rehearing En Banc*. We also have a response from the appellees. In addition, also before the court is a motion from the ACLU Foundation of Colorado and related entities seeking leave to file a brief amicus curiae in support of en banc rehearing.

As a preliminary matter, and upon consideration, we grant the motion submitted by the ACLU to file a brief amicus curiae. The brief received originally on August 26, 2019 will be shown filed on the docket effective the original date of submission.

Upon consideration of the rehearing request, and pursuant to the panel's inherent authority, the court *sua sponte* grants panel rehearing to the extent of the changes made in the attached revised opinion. A revised dissent is likewise attached to this order. The clerk is directed to reissue the revised decision and dissent effective today's date.

The *Petition*, response, and the revised opinion and dissent were also circulated to all the judges of the court in regular active service who are not otherwise disqualified. *See* Fed. R. App. P. 35(a). As no judge on the original panel or the en banc court requested that a poll be called, the *Petition for Rehearing En Banc* is denied.

Entered for the Court

*Elisabeth A. Shumaker*

ELISABETH A. SHUMAKER, Clerk

2

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 3, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

STEVE RAY EVANS,

    Plaintiff - Appellant,

v.

SANDY CITY, a municipal corporation;
TIM DOLAN, Mayor of Sandy City;
KEVIN THACKER, Sandy City Police
Chief; ROBERT WALL, Sandy City
Attorney; DOUGLAS JOHNSON, Sandy
City Prosecutor; R. MACKAY HANKS,
Sandy City Prosecutor; SCOTT
COWDELL, Sandy City Council Member;
MAREN BARKER, Sandy City Council
Member; KRISTIN COLEMAN-
NICHOLL, Sandy City Council Member;
CHRIS MCCANDLESS, Sandy City
Council Member; STEVE FAIRBANKS,
Sandy City Council Member; LINDA
MARTINEZ SAVILLE, Sandy City
Council Member; STEPHEN P. SMITH,
Sandy City Council Member; C. TYSON,
Sandy City Police Department; C.
PINGREE, Sandy City Police Department;
J.E. BURNS, Sandy City Police
Department; JOHN DOE I-XX, Sandy City
Police Department,

    Defendants - Appellees.
_____

No. 17-4179

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:17-CV-00408-BSJ)**
_____

Angela H. Elmore, Utah Legal Clinic Foundation (John Robinson, Jr., The Law Office of John Robinson, Jr., with her on the brief), Salt Lake City, Utah, for Plaintiff-Appellant.

Troy L. Booher, Zimmerman Booher (Freyja R. Johnson, Zimmerman Booher; Michael D. Black, Parr Brown Gee & Loveless; David C. Reymann, Parr Brown Gee & Loveless, with him on the brief), Salt Lake City, Utah, for Defendants-Appellees.

_____

Before **BRISCOE**, **BALDOCK**, and **EID**, Circuit Judges.

_____

**BALDOCK**, Circuit Judge

_____

In 2016, the Sandy City, Utah city council adopted an ordinance making it illegal for any person "to sit or stand, in or on any unpaved median, or any median of less than 36 inches for any period of time." Sandy City Traffic Code, Article 16, Section 299.1 (the Ordinance). After the Sandy City council adopted the Ordinance, Plaintiff-Appellant Steve Ray Evans received four citations for violating the Ordinance when he stood on narrow or unpaved medians. Evans filed suit against the City and many of its officials under 42 U.S.C. § 1983 in the district court of Utah, alleging the Ordinance is facially invalid because it violates the First Amendment right to free speech. Evans also asked the district court to grant his request for a preliminary injunction. The City filed a motion for summary judgment and the court allowed discovery. After a hearing on the motion, the district court denied Evans' preliminary injunction and granted summary judgment in favor of the City because the Ordinance was a valid time, place,

2

or manner restriction on speech.[1] Evans appealed, arguing the district court incorrectly applied the time, place, or manner standard and wrongly granted summary judgment because the City did not satisfy its evidentiary burden. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.

We review a district court's summary judgment ruling de novo, applying the same standard as the district court. *iMatter Utah v. Njord*, 774 F.3d 1258, 1262 (10th Cir. 2014). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reviewing a motion for summary judgment, "we review the facts and all reasonable inferences those facts support, in the light most favorable to the nonmoving party." *iMatter*, 774 F.3d at 1262 (citation omitted). Because this decision implicates First Amendment freedoms, we perform an independent examination of the whole record in order to ensure that the judgment protects the right of free expression. *Faustin v. City and Cty. of Denver*, 423 F.3d 1192, 1196 (10th Cir. 2005). Here, the City carries the burden to justify the Ordinance with uncontested facts. *See iMatter*, 774 F.3d at 1263.

## II.

---

[1] Mr. Evans also alleged the Ordinance violated the Eighth Amendment, the Fourteenth Amendment Equal Protection Clause, the Dormant Commerce Clause, and Title VII of the Civil Rights Act. The district court dismissed each of Evans' claims with prejudice and granted summary judgment in favor of the City. Mr. Evans does not appeal any of those claims.

Today, we confront whether the Ordinance, which prohibits the sitting or standing on medians that are unpaved or less than 36 inches wide (hereinafter "affected medians"), violates the First Amendment. The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws "abridging the freedom of speech." U.S. Const. amend. I. The First Amendment "applies not only to legislative enactments, but also to less formal governmental acts, including city policies," such as the Ordinance at issue. *Hawkins v. City and Cty. of Denver*, 170 F.3d 1281, 1286 (10th Cir. 1999).

A.

As a threshold matter, we must first consider whether the activity in question constitutes protected speech under the First Amendment. *See Cornelius v. NAACP Legal Def. & Educ. Fund., Inc.*, 473 U.S. 788, 797 (1985) ("[I]f [the speech] is not [protected], we need go no further."). Here, Evans contends the Ordinance restricts his ability to panhandle and solicit financial support. According to the Supreme Court, "the solicitation of charitable contributions is protected speech." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 789 (1988). Neither the Supreme Court nor this Circuit has directly addressed whether panhandling is protected speech under the First Amendment but several of our sister circuits who reached the question determined panhandling is protected. *See Reynolds v. Middleton*, 779 F.3d 222, 225 (4th Cir. 2015); *Speet v. Schuette*, 726 F.3d 867, 870 (6th Cir. 2013); *Smith v. City of Fort Lauderdale*, 177 F.3d 954, 956 (11th Cir. 1999); *Loper v. N.Y.C. Police Dep't*, 999 F.2d 699, 704 (2d Cir. 1993). Assuming without deciding panhandling is protected

4

under the First Amendment, as we will explain later, the Ordinance is a valid time, place, or manner restriction. *See Gresham v. Peterson*, 225 F.3d 899, 904–05 (7th Cir. 2000) (after "assuming . . . some panhandler speech would be protected by the First Amendment," the Seventh Circuit applied the First Amendment "time, place, and manner" framework.).

We note that while solicitation and panhandling laws are on the books in cities across the United States and challenges to such laws have been similarly widespread, an astute reader will recognize the Ordinance challenged here is not a ban on panhandling or solicitation like many other ordinances. Instead, the Ordinance is a restriction on sitting or standing on narrow and unpaved medians. This distinction will become important later, but for now we assume Evans' form of speech, panhandling, is protected speech.

## B.

We turn next to the nature of the forum affected by the Ordinance. Under First Amendment jurisprudence, "the extent to which the Government can control access [to Government property] depends on the nature of the relevant forum." *Cornelius*, 473 U.S. at 800. The Supreme Court has identified three categories of Government property subject to First Amendment analysis: (1) traditional public fora; (2) designated public fora; and (3) nonpublic fora. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45–46 (1983). A traditional public forum is a place that "by long tradition or by government fiat ha[s] been devoted to assembly and debate." *Id*. at 45. "Because a principal purpose of traditional public fora is the free

5

exchange of ideas, speakers can be excluded from a public forum only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." *Cornelius*, 473 U.S. at 800 (citing *Perry*, 460 U.S. at 45). In contrast, designated public fora are places that are not generally open to the public for First Amendment activity and "are created by purposeful governmental action" to allow speech activity. *Arkansas Educ. Television Com'n v. Forbes*, 523 U.S. 666, 677 (1998). A nonpublic forum is anything that does not qualify as a traditional or designated public forum. Access to a nonpublic forum "can be restricted as long as the restrictions are 'reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view.'" *Cornelius*, 473 U.S. at 800 (quoting *Perry*, 460 U.S. at 46) (alteration in original).

Evans contends "[m]edians are widely considered [traditional] public fora" whereas the City contends the affected medians are nonpublic fora. The district court did not decide the issue, concluding the forum designation was not dispositive since the Ordinance was valid even under the stricter standard for traditional public fora. We agree with the district court. As we will explain, the Ordinance is a valid time, place, or manner regulation; thus, we need not decide if the affected medians are more appropriately classified as nonpublic fora.[2]

---

[2] Although courts have concluded medians that resemble parks are traditional public fora, we have serious reservations extending such conclusions to the affected medians in this case, some of which are 17-inch traffic dividers that have hardly been "by long tradition . . . devoted to assembly and debate." *Perry*, 460 U.S. at 45; *see, e.g.*, *Warren v. Fairfax Cty.*, 196 F.3d 186, 189 (4th Cir. 1999) ("We hold that the Center Island mall is a traditional public forum" because it is "best characterized as a

6

C.

Assuming without deciding the affected medians are traditional public fora, we turn to whether the Ordinance is a valid restriction of protected speech. It is well-settled "that even in a public forum the government may impose reasonable restrictions on the time, place, and manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of information.'" *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)). We address each of the three requirements in turn.

### 1. Content Neutrality

Recall, the Ordinance proscribes any person "to sit or stand, in or on any unpaved median, or any median of less than 36 inches for any period of time." Sandy City Traffic Code, Article 16, Section 299.1. No one disputes the Ordinance is facially content neutral because it "does not draw content-based distinctions on its face." *McCullen v. Coakley*, 573 U.S. 464, 479 (2014). The law applies evenhandedly to all who sit or stand on narrow or unpaved medians irrespective of the content of their message.

---

park or mall."). Nevertheless, we assume without deciding the affected medians are traditional public fora.

Even though the Ordinance is content-neutral on its face, the Ordinance may nevertheless be content-based if the government adopted the Ordinance "because of disagreement with the message it conveys." *Ward*, 491 U.S. at 791. "The *government's purpose* is the *controlling consideration*. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Id*. (emphasis added). "Government regulation of expressive activity is content neutral so long as it is 'justified without reference to the content of the regulated speech.'" *Id.* (quoting *Cmty. for Creative Non-Violence*, 468 U.S. at 293).

The record indicates the City justified the Ordinance without reference to the content of the regulated speech. Specifically, the City police captain explained during a City council meeting that people sitting or standing on narrow or unpaved medians are a public safety hazard. The police captain explained the Ordinance sought to limit that danger because there had been "several close calls" where accidents involving pedestrians and vehicles "could [have] be[en] devastating." The City's public safety justification is further confirmed by the process the City prosecutor used to draft the Ordinance. First, the City prosecutor received notice the police "were having some problems with safety issues" with people falling into traffic. To deal with this problem, the City prosecutor set out to draft the Ordinance. He gathered information by surveying the City's medians. Then, he drafted the Ordinance to exclusively target medians where it was dangerous to sit or stand for any length of time, regardless of the speech that might occur. In his judgment, paved medians less than 36-inches wide

8

were dangerous to sit or stand on because they were too narrow to provide refuge from passing cars. He also concluded unpaved medians, which were typically covered in rocks, boulders, and in some cases shrubs, were dangerous because pedestrians could easily lose their footing or trip on uneven surfaces. At all times, the City has maintained its sole justification for the Ordinance is to promote public safety.

In spite of this clear public safety purpose, Evans contends the Ordinance is not content neutral because the City acted, in part, because it disagreed with panhandling. Evans suggests the City's public safety justification is a façade for its improper motive to suppress panhandlers' speech. In support, Evans points to one question and one statement made by two councilmembers at the City council meeting where the police captain presented the proposed Ordinance. One councilmember asked, "we're going to give homeless people citations?" No reasonable factfinder could conclude this question provides evidence the City adopted the Ordinance "because of a disagreement with the content" of panhandlers' speech. At most, the question reveals one councilmember acknowledged the Ordinance would have an incidental effect on panhandling. But it is well-settled such an incidental effect on some speakers or messages does not make a regulation content-based. *See Ward*, 491 U.S. at 791 ("A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others."); *see also City of Renton v. Playtime Theaters, Inc.*, 475 U.S. 41, 49 (1986) (classifying a restriction on the location of adult movie theaters as content neutral because the ordinance was aimed not at the content of the films shown, but rather at

9

the secondary effects of such theaters on the surrounding community); *McCullen*, 573 U.S. at 480 (classifying an ordinance that exclusively restricted speech at abortion clinics as content neutral because the ordinance was aimed at public safety, even though it had an incidental effect on abortion-related speech). Therefore, this question most certainly does not turn the Ordinance into a content-based restriction.

Additionally, Evans contends a councilmember's statement, "And I don't even know who stops there to give them anything in the middle of traffic as it's going," shows the City adopted the Ordinance because it disagreed with panhandling. Like the councilmember's question, no reasonable factfinder could conclude the statement provides evidence the City adopted the Ordinance because of a disagreement with the content of panhandler's speech. This is especially true when the statement is read in context. The councilmember's entire statement and the City police captain's response indicates the councilmember endorsed the Ordinance to promote public safety:

> I drove 106th the other day at about noon and there were four people standing on [a] median and they were talking, you know, this group of guys were just talking there and, boy, if one of them would have stepped backwards a foot—'cause they were on [a median] narrower than three feet—[Police Captain: "Correct"]—they would've been just wiped out—[Police Captain: "I believe it is approximately 16 inches"]—Really it was scarey [sic] for me and it's for their own safety, you know. And I don't even know who stops there to give them anything in the middle of traffic as it's going.

This statement *supports* the City's public safety justification for passing the Ordinance. Conspicuously, the statement says nothing about the content of panhandlers' speech,

10

let alone provides evidence the City passed the Ordinance because it disagreed with their message. Accordingly, the Ordinance is content neutral.[3]

### 2. *Narrowly Tailored to Serve a Significant Government Interest*

"Even though the [Ordinance] is content neutral, it still must be 'narrowly tailored to serve a significant governmental interest.'" *McCullen*, 573 U.S. at 486 (quoting *Ward*, 491 U.S. at 796). No one disputes the Ordinance serves a significant governmental interest in promoting public safety. In fact, even Evans acknowledges "[t]here's no real dispute about whether keeping cars and pedestrians away from each other would, at least in some way, make Sandy City a safer place." Op. Br. at 25 (citing *Int'l Soc'y for Krishna Consciousness v. City of Baton Rouge*, 668 F. Supp. 527, 530 (M.D. La. 1987) ("It requires neither towering intellect nor an expensive 'expert' study to conclude that mixing pedestrians and temporarily stopped motor vehicles in the same space at the same time is dangerous.")). With both parties in agreement, we need not belabor the point: the Ordinance promotes public safety in a direct and effective way by keeping pedestrians off thin slices of pavement and unpaved traffic dividers where pedestrians could be injured by passing traffic.

We turn, instead, to the hotly contested question: whether the Ordinance is narrowly tailored to serve that interest. To be narrowly tailored, the Ordinance must not "burden substantially more speech than is necessary to further the government's

---

[3] Evans also argues we should consider City councilmembers' post-enactment comments as evidence relevant to their motivations for passing the Ordinance. Evans cites no authority to support the use of such comments as bearing on legislative purpose.

11

legitimate interests." *Ward*, 491 U.S. at 799. In other words, the government "may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *McCullen*, 573 U.S. at 486 (quoting *Ward*, 491 U.S. at 799). This requirement demands a "close fit between ends and means" to ensure speech is not sacrificed for efficiency. *Id.* We look "to the amount of speech covered by the ordinance and whether there is an appropriate balance between the affected speech and the governmental interests that the ordinance purports to serve." *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150, 165 (2002).

At the same time, such regulation "need not be the least restrictive or least intrusive means of doing so. Rather, the requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Ward*, 491 U.S. at 798−99 (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)). "So long as the means chosen are not substantially broader than necessary to achieve the government's interest, . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Id.* at 800. "'The validity of [time, place, or manner] regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests' or the degree to which those interest should be promoted." *Id.* at 800 (quoting *Albertini*, 472 U.S. at 689).

Here, the City adopted the Ordinance to promote "public health, safety and [the] welfare of the City" after there had been several "close calls" where individuals reported pedestrians on medians in dangerous situations. Evans nevertheless contends the Ordinance is not narrowly tailored. To this end, Evans makes three main arguments. We address each in turn.

a.

First, relying on *McCullen*, Evans claims the Ordinance places a substantial burden on speech because it requires him to sit or stand a substantial distance away from the most effective places to communicate with his target audience. In *McCullen*, the Supreme Court determined an ordinance requiring a buffer zone around abortion clinics imposed a substantial burden on speech and "effectively stifled petitioners' message" because the ordinance prevented petitioners from engaging in close, personal conversations with their target audience of women entering the clinics. *McCullen*, 573 U.S. at 489-90. Similarly, Evans claims standing on medians where he can talk to drivers in vehicles is the most effective way to communicate with his target audience and the Ordinance prevents him from doing so.

We are not persuaded. Evans received two citations for standing on a paved 17-inch median. A mere ten feet away from where he was cited, the median is wider than 36 inches and is therefore unaffected by the Ordinance. We simply cannot accept this ten-foot difference *on the same median* as a substantial burden on speech. In compliance with the Ordinance, Evans can stand on wide, paved medians to communicate effectively with his target audience. Unlike *McCullen*, the Ordinance

13

does not effectively stifle Evans' ability to communicate his message to his target audience.

b.

Second, Evans contends the City failed to show it properly balanced speech against safety. To ensure a regulation does not burden substantially more speech than necessary to further the government's interests, narrow tailoring requires "a close fit between ends and means" to ensure speech is not sacrificed for efficiency. *McCullen*, 573 U.S. at 486 (citing *Nat'l Fed'n of the Blind*, 487 U.S. at 795). Fit matters, but narrow tailoring "does not require perfect tailoring. The doctrine requires only that a challenged speech restriction not burden 'substantially' more speech than is necessary to further the government's interest." *Cutting v. City of Portland*, 802 F.3d 79, 86 (1st Cir. 2015).

Evans contends the City did not meet its burden to justify the fit between the ends and the means when it failed to "compile any data, statistics, or accident reports." According to Evans, "[u]nder *McCullen*, Sandy City's failure to conduct research and analysis is dispositive. . . . Indeed, that's the grit of *McCullen*: governments must provide real evidence to justify their public safety concerns." In *McCullen*, the Supreme Court explained evidence of a problem at one abortion clinic at one time did not justify the burden on other clinics at other times. Specifically, the Supreme Court stated, "Respondents point us to no evidence that individuals regularly gather at other clinics, or at other times in Boston, in sufficiently large groups to obstruct access. For a problem shown to arise only once a week in one city at one clinic, creating 35-foot

14

buffer zones at every clinic across the Commonwealth [of Massachusetts] is hardly a narrowly tailored solution." *McCullen*, 573 U.S. at 493. The Supreme Court's language does not create a new evidentiary requirement for governments to compile data or statistics. Instead, governments bear the same burden to show a regulation does not "burden substantially more speech than is necessary to further the government's legitimate interests." *Id*. at 486 (quoting *Ward*, 491 U.S. at 799).

Here, a direct relationship exists between the City's goal of promoting public safety and the restriction on speech it selected. The Ordinance is limited only to those medians where it is unsafe to sit or stand. The City police captain—a City official who had years of experience dealing with unsafe situations involving pedestrians on medians in Sandy City—conducted a survey of the medians in Sandy City. The City prosecutor also surveyed the medians within the City. Based on what they observed, the City drafted the Ordinance limiting it only to those medians where it would be dangerous to sit or stand at any time of day, at any traffic speed or volume. The City prosecutor explained he included unpaved medians where the "footing isn't uniform," which posed a tripping hazard. He included narrow medians after walking on them and determining what width would provide sufficient refuge from passing traffic. Such evidence is sufficient to satisfy the City's burden to show the Ordinance does not "burden substantially more speech than is necessary to further the government's legitimate interests." *Id.* (quoting *Ward*, 491 U.S. at 799). The Ordinance only prohibits sitting or standing on narrow or unpaved medians where it would be dangerous to do so. This is the sort of close fit the narrow tailoring requires.

15

Evans also contends the City failed to satisfy its evidentiary burden because it did not provide accident reports or complaints regarding medians in all parts of the City. Evans would have this Court require the City to restrict speech in a piece-meal fashion, median by median, only upholding an ordinance after there is a report of a "close call" on a particular median, or worse, someone gets injured. The First Amendment "prevents the government from too readily 'sacrific[ing] speech for efficiency.'" *Id.* at 486 (quoting *Nat'l Fed'n of the Blind*, 487 U.S. at 795). It does not require the government to wait for accidents to justify safety regulations. *See Traditionalist American Knights of the Ku Klux Klan v. City of Desloge*, 775 F.3d 969, 975 (8th Cir. 2014) ("The fact that a pedestrian had not yet been hit while distributing materials in the city did not mean that it was not dangerous, for a government need not wait for accidents to justify safety regulations.") (quotations omitted).

c.

Third, Evans argues the Ordinance is not narrowly tailored because the City did not demonstrate alternative measures that burden substantially less speech would fail to promote public safety. According to Evans, since the City did not "*prove* that it actually *tried* other methods to address the problem," such as alternatives that distinguish between high and low traffic areas, traffic volume, or time of day, we should strike down the Ordinance as not narrowly tailored. Op. Br. at 31. (quoting *Reynolds*, 779 F.3d at 231 (emphasis in original)).

"[A] regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but

16

. . . it need not be the least restrictive or least intrusive means of doing so." *Ward*, 491 U.S. at 798. "*So long as the means chosen are not substantially broader than necessary to achieve the government's interest, . . .* the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Id.* at 800 (emphasis added). *McCullen* does not change that. In *McCullen*, the Court determined the means chosen were substantially broader than necessary to achieve the government's interest. As part of its "substantially broader than necessary" analysis, the Court identified several less restrictive alternatives that would have plausibly achieved the government's stated interest. *McCullen*, 573 U.S. at 491–93. Thus, *McCullen* taught us a less restrictive means analysis might be helpful in the narrow tailoring inquiry, but it did not modify *Ward*'s clear rule. *See McCullen*, 573 U.S. at 486 (citing *Ward*, 491 U.S. at 798) (holding a content neutral restriction on speech "need not be the least restrictive or least intrusive means of serving the government's interests").

In this case, the less restrictive means identified by Evans and the dissent are clearly inadequate. For example, the dissent suggests Sandy City might have considered limiting activity on the medians at night, when the dark makes it more difficult for drivers to see. In the very next sentence, the dissent suggests the City could have limited the Ordinance to times of day when traffic is busiest. But, to do both of these things—limiting median activity at night and during heavy traffic times—would essentially constitute a twenty-four-hour ban. Even if the Ordinance left open a window from 10 a.m. to 3 p.m., it is not at all implausible that a driver could strike

17

someone standing on the median during those hours. The danger stems from cars—whether it be one or one hundred—traversing a roadway in which pedestrians are standing precariously within striking distance. The dissent also suggests the Ordinance could apply to medians where traffic speed is greatest. But again, whether a pedestrian is struck at 15 MPH or 50 MPH, injury is sure to result.

In addition to narrowing the Ordinance by time of day or vehicle traffic, the dissent suggests the City could have tailored the Ordinance to apply only to those medians which were the focus of the complaints the City received. However, while the complaints identified a danger to people standing on medians—and contributed to the development of the Ordinance in this case—the complaints are not what *created* the danger. Just because Sandy City has not received a complaint about every 36-inch median in the city does not make it any less dangerous for pedestrians to stand on them. Finally, the dissent suggests the City could enforce its existing laws on public intoxication and impeding traffic to reach the same result. To make this approach effective, however, a police officer would have to sit and watch a person on the median until they fell into traffic—again defeating the City's goal of promoting public safety.

Ultimately, the Ordinance is not substantially broader than necessary to promote public safety. On both narrow and unpaved medians, the restriction on speech is directly tailored to the danger. We will not invalidate the Ordinance "simply because there is some imaginable alternative that might be less burdensome on speech." *Ward*, 491 U.S. at 797 (quoting *Albertini*, 472 U.S. at 689). The City is not required to ignore the danger posed by standing on a 17-inch sliver of concrete just because lighter traffic

18

may make it less likely one will be hit by a car. While we could posit an infinite number of potentially less restrictive alternatives, the Supreme Court instructs us that the validity of a content neutral regulation "does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests." *Ward*, 491 U.S. at 800 (citing *Albertini*, 472 U.S. at 689). The Ordinance is narrowly tailored to the public safety problem the City sought to address. Because the means fit closely with the ends, First Amendment jurisprudence does not require the City to prove that some imaginable alternative would fail to achieve the government's interest in public safety.

### 3. *Ample Alternative Channels of Communication*

Finally, a reasonable time, place, or manner restriction of protected speech must "leave open ample alternative channels for communication of information." *Ward*, 491 U.S. at 791. "While the First Amendment does not guarantee the right to employ every conceivable method of communication at all times and in all places, a restriction on expressive activity may be invalid if the remaining modes of communication are inadequate." *City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 812 (1984) (citations omitted). To determine whether alternative channels are adequate, courts assess in part the speaker's ability to reach his or her target audience. *Ward*, 491 U.S. at 802.

No one disputes the Ordinance leaves open many alternative channels for Evans to communicate, including paved medians wider than 36 inches, every city sidewalk, and every city park. Despite the available alternatives, Evans contends sidewalks and

19

parks are not adequate because he cannot reach his target audience—drivers in vehicles—as effectively compared to medians.

Setting aside whether Evans can "effectively" communicate with his target audience on sidewalks and in parks, the City argues roughly 7,000 linear feet of wide, paved medians in the City remain unaffected by the Ordinance. Evans does not dispute that. And critically, at no point does Evans distinguish his ability to communicate with his target audience on affected or unaffected medians. Evans' target audience is indistinguishable on affected and unaffected medians. Recall, the City cited Evans twice for standing on a narrow median. Only ten feet away from where the City cited Evans, the paved median is wider than 36 inches and therefore unaffected by the Ordinance. Given Evans "prefers to stand on medians" and he never argued wide, paved medians were inadequate to effectively communicate with drivers in vehicle, the 7,000 linear feet of unaffected medians in the City provide Evans ample alternative channels for communication with his target audience.

### III.

The Ordinance—narrow in its purpose, design, and effect—does not discriminate based on content, is narrowly drawn to serve an important governmental interest, and permits Evans to express his views, including the solicitation of financial support, on literally thousands of linear feet within Sandy City. The judgment of the district court is AFFIRMED.

20

No. 17-4179, *Evans v. Sandy City*
**BRISCOE**, Circuit Judge, dissenting.

I respectfully dissent. In my view, Sandy City has not carried its burden to establish that the Ordinance is narrowly tailored to serve a significant governmental interest.[1] Nor has Sandy City established that the affected medians are nonpublic fora. I would reverse the district court's grant of summary judgment to the City and remand for further proceedings.

I

As the majority acknowledges, when a regulation is content neutral,[2] "the requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation, and does not burden substantially more speech than is necessary to further the government's legitimate interests." Wells v. City & Cty. of Denver, 257 F.3d 1132, 1148

---

[1] The majority assumes that panhandling is protected speech, and I would affirmatively conclude that it is. As the majority notes, the Supreme Court has stated that "the solicitation of charitable contributions is protected speech." Maj. Op. at 4 (quoting Riley v. Nat'l Fed'n of the Blind, 487 U.S. 781, 789 (1988)); see also Village of Schaumburg v. Citizens for a Better Env't, 444 U.S. 620, 632 (1980) ("[C]haritable appeals for funds, on the street or door to door, involve a variety of speech interests— communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes—that are within the protection of the First Amendment."). And every one of our sister circuits to reach the question has concluded that panhandling is protected speech. See Reynolds v. Middleton, 779 F.3d 222, 225 (4th Cir. 2015); Speet v. Schuette, 726 F.3d 867, 870 (6th Cir. 2013); Smith v. City of Fort Lauderdale, 177 F.3d 954, 956 (11th Cir. 1999); Loper v. N.Y.C. Police Dep't, 999 F.2d 699, 704 (2d Cir. 1993); accord Comite de Jornaleros v. City of Redondo Beach, 657 F.3d 936, 945 (9th Cir. 2014) (en banc) (holding that solicitation is protected speech).

[2] I agree with the majority that the Ordinance is content neutral.

(10th Cir. 2001) (quotations and ellipsis omitted).  Here, the City has failed to show that the Ordinance does not burden substantially more speech than is necessary to further the City's legitimate interest in public safety.[3]

A

To determine whether the Ordinance is narrowly tailored, we first look, as the majority did, to the amount of speech it burdens.  See Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton, 536 U.S. 150, 165 (2002) ("We must . . . look . . . to the amount of speech covered by the ordinance and whether there is an appropriate balance between the affected speech and the [state] interests that the ordinance purports to serve.").  Contrary to the majority's view, Maj. Op. at 12–13, I would conclude that the Ordinance places a substantial burden on speech.

The Ordinance bans all speech on affected medians at all times.  See Sandy City Traffic Code, Article 16, Section 299.1.  The Ordinance also applies to a substantial number of Sandy City's medians.  Although the record does not include the exact number of affected medians, the record indicates that this number is significant, as it contains "over 100 pages of photographs depicting nearly every different type" of affected median.  Aplt. Reply at 4; accord Aplee. App., Vol. II at 109–276.  Because the Ordinance prohibits all expressive activity at all times on many medians throughout

---

[3] I also agree with the majority that the City's interest in public safety is legitimate and substantial.

Sandy City, it "serious[ly] burdens . . . speech." McCullen v. Coakley, 573 U.S. 464, 487 (2014).[4]

B

In conducting the narrowly tailored analysis, we must look to "the specific . . . interest articulated by the City." Citizens for Peace in Space v. City of Colo. Springs, 477 F.3d 1212, 1223 (10th Cir. 2007). "Indeed, to assess whether a restriction is an appropriate 'fit' to some important government interest, it is necessary that the government interest be specifically defined." Id. Here, the City enacted the Ordinance because it was "worried about people falling into traffic." Aplt. App., Vol. II at 291. When addressing the City Council in support of the Ordinance, Sandy City Police Chief O'Neal described the safety danger as follows: "If someone trips and steps out into traffic, especially with the speed that traffic goes through [one specific] area, it could be devastating." Aplt. App., Vol. I at 177. The First Amendment analysis must therefore examine the fit between the City's stated interest, preventing people from falling off medians into traffic, and the City's chosen means, banning all sitting or standing on all unpaved medians and all paved medians narrower than 36 inches.

---

[4] The majority evaluates the Ordinance's burden on speech only with reference to whether the Ordinance renders Evans's panhandling less effective. To be sure, much of Evans's argument regarding the Ordinance's burden on speech focuses on the decreased efficacy of his speech because he is prohibited from using many medians to panhandle. But Evans's narrow-tailoring argument also argues that the Ordinance applies to numerous medians throughout the City. See Aplt. Br. at 32 ("Given that the City's evidence supported a conclusion that there were, at most, a few problem areas in Sandy, the City needed to try using less restrictive tools before it implemented a city-wide ban.").

C

After identifying the specific interest the City articulates, we must determine on this summary judgment record if the Ordinance is narrowly tailored to serve that interest; that is, if the Ordinance "burden[s] substantially more speech than is necessary to further the [City's] legitimate interests." Ward v. Rock Against Racism, 491 U.S. 781, 799 (1989). "[R]estrictions on the time, place, or manner of protected speech are not invalid simply because there is some imaginable alternative that might be less burdensome on speech." Id. at 797. Rather, "[t]he scope of the restriction on speech must be reasonably, though it need not be perfectly, targeted to address the harm intended to be regulated." 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 529 (1996) (O'Connor, J., concurring).

When deciding on the scope of the Ordinance, Sandy City Police Captain Justin Chapman and Sandy City Prosecutor Doug Johnson visited medians in Sandy City to determine which were "safe" and which were "unsafe." See Aplt. App., Vol. II at 292–93. The majority characterizes Chapman's and Johnson's process as a "survey of the medians in Sandy City." Maj. Op. at 15; accord id. at 8. I find that description generous, to say the least.

Johnson concluded which medians were "safe" based on whether, while standing on a median, he felt he was likely to be hit by a moving vehicle. Johnson made this determination "anecdotally," Aplt. App., Vol. II at 293, employing the following methodology:

4

I would just stand on a median and go, "This is scary. I just almost got hit." And then I would walk somewhere where it was just a little bit wider and go, "This is scary. I almost got hit." And then I would walk somewhere that was just a little bit wider, until finally I found a place where I said, "I don't think I could get hit there." And . . . then I noted that place, went back to the police department, asked them to go get measurements for where I was standing, and went from there.

Id. Johnson conducted this experiment on one median in Sandy City.

Chapman visited "[a] lot" of medians throughout Sandy City and measured the width of medians throughout "the main arteries [of Sandy City] that . . . had obvious islands." Id. at 357–58. Chapman "didn't feel any of the islands regardless [of width] were safe to be on." Id. at 359. After visiting the medians, Chapman concluded that the "not smooth," "unpaved medians" had "landscaping that would cause a tripping hazard." Id. This conclusion was based on his

feeling, if you had a person that was walking, standing, whatever they're doing in the area where cars are whizzing by, if it's unpaved, or uneven . . . , you have the potential to trip on something like that . . . . That seemed it could be a little bit more unsafe because whether or not you're specifically choosing a path one way or another, you simply catch your toe on a rock and boom, you're in the traffic.

Id. at 359–60.

In addition to relying on Johnson's and Chapman's opinions, the City justifies the Ordinance by pointing to complaints that the Sandy City police received about people on medians.[5] The record contains twenty-nine documented complaints between October 7,

_____

[5] Although the City cites complaints as evidence that the Ordinance was necessary, the majority does not rely on the complaints at all, stating only that the First Amendment "does not require the government to wait for accidents to justify safety regulations." Maj. Op. at 15. Be that as it may, the First Amendment does require the

5

2014, and April 29, 2017, twenty-eight of which relate to people standing on Sandy City medians.[6] See Aplee. App., Vol. II at 277–341. Most of the complaints arise from one small area of the city. Indeed, at least twenty-two of the twenty-nine complaints relate to locations within half a mile of each other, all of which are near on- and off-ramps for Interstate Highway 15. Based on Johnson's and Chapman's surveys and the complaints regarding people in the median, Sandy City enacted the Ordinance, which states in full:

> It shall be illegal for any individual to sit or stand, in or on any unpaved median, or any median of less than 36 inches for any period of time.

Sandy City Traffic Code, Article 16, Section 299.1.

I view this record as inadequate to support the City's ban of all expressive activities in numerous medians throughout the city. First, Johnson and Chapman articulate no objective basis for their opinions. Rather, Johnson characterized his determination of which medians were safe as being made "anecdotally," Aplt. App., Vol. II at 293, and Chapman relied on his "feeling" to determine which medians "seemed [they] could be a little bit more unsafe," id. at 359–60.[7] In the First Amendment context,

---

government to "demonstrate that the recited harms," here, the danger of people falling off medians into traffic, "are real, not merely conjectural, and that the regulation will in fact alleviate those harms in a direct and material way." Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 664 (1994) (plurality opinion).

[6] One complaint does not seem related to an individual standing on a median at all. See Aplee. App., Vol. II at 303 ("[M]ale in traffic . . . on foot . . . in and out of traffic.").

[7] The 36-inch width limitation did not stem from Chapman's opinions regarding safety. Rather, Chapman "didn't feel any of the islands regardless [of width] were safe to be on." Aplt. App., Vol. II at 359. Chapman's "years of experience dealing with unsafe situations involving pedestrians on medians in Sandy City," Maj. Op. at 15, therefore did not inform the Ordinance's width limitation.

6

this is not enough.  See Turner Broad. Sys., Inc. v. FCC, 520 U.S. 180, 196 (1997) ("[I]n the realm of First Amendment questions," the legislature "must base its conclusions upon substantial evidence."); see also McCullen, 573 U.S. at 496 ("Given the vital First Amendment interests at stake, it is not enough for [the City] simply to say" that the Ordinance is necessary.).

Second, the complaints the City submitted do not indicate that the Ordinance is tailored to address the City's articulated interest in preventing people from falling off medians into traffic.  Even to the extent the complaints support a conclusion that sitting or standing on medians is in fact dangerous,[8] most of the complaints pertain to one small part of the city.  As the Supreme Court noted in McCullen, "[f]or a problem shown to arise only once a week in one city at one clinic, creating 35–foot buffer zones at every clinic across the Commonwealth is hardly a narrowly tailored solution."  573 U.S. at 493.  Here, the complaints indicate a problem that arises infrequently and in a single area of Sandy City.[9]  The City's decision in this case to ban all sitting or standing on many medians throughout the city is, as in McCullen, "hardly a narrowly tailored solution."  Id.

---

[8] Several of the complaints were regarding the mere presence of individuals on medians and expressed no traffic-safety concerns.  See, e.g., Aplee. App., Vol. II at 287 ("[T]ransient standing on the median asking for money for his infection."); id. at 312 ("Panhandler on the island stopping traffic and asking for money."); id. at 324 (indicating that a "panhandler" is in the "middle of [the] road"); id. at 333 ("Panhandler on the median . . . getting mad when being refused" and "spit on [the] comp[lainant's] truck.").

[9] The record indicates that the twenty-nine complaints in the record could be underinclusive.  Regardless, Chapman—who testified that he personally fielded complaints that may not have been documented—stated that "[m]ost of" the complaints related to medians "at intersections" and involved the main roads and places with freeway access. Aplt. App., Vol. II at 353.

Further, the record does not reveal the characteristics of the medians involved in the complaints—whether the medians are narrower than 36 inches, wider than 36 inches, paved, or unpaved. In other words, the record does not show whether the Ordinance in fact addresses any problem the complaints identified. As a result, we are unable to determine whether the problem the City identified from the complaints—the potential for people to fall off medians into traffic—would actually be addressed by the Ordinance's prohibitions. Absent such evidence of tailoring—of a relationship between the end and the means—the Ordinance fails. See, e.g., McCutcheon v. Fed. Election Comm'n, 572 U.S. 185, 218 (2014) ("In the First Amendment context, fit matters.").

As drafted, the Ordinance burdens a substantial amount of speech. And Sandy City has failed to show that the Ordinance does not "burden substantially more speech than is necessary to further" its interest in preventing people from falling off medians into traffic. Ward, 491 U.S. at 799. Given the amount of speech it burdens, the interest the City identified to justify that burden, and the lack of fit between the two, the Ordinance is not narrowly tailored and does not survive intermediate scrutiny.

D

The Ordinance also fails intermediate scrutiny because "[the City] must demonstrate that alternative measures that burden substantially less speech would fail to achieve [its] interests." McCullen, 573 U.S. at 495.

In McCullen, the Supreme Court's entire narrow-tailoring analysis consisted of discussing alternative measures the government could have utilized to further its substantial interests. See id. at 490–96. The Supreme Court first articulated the

8

government's stated interest, then identified other regulations already in existence "that prohibit[] much of [the targeted] conduct," id. at 491, and alternative regulations the government could enact that would prohibit the targeted conduct, id. at 491–93. The Court concluded that the challenged regulation was substantially more broad than necessary because of the availability of less speech-restrictive alternatives. Id. at 490–94; accord Verlo I, 820 F.3d at 1135 ("[W]hen considering content-neutral regulations, the [Supreme] Court itself has examined possible alternative approaches to achieving the [state's] objective to determine whether the [state's] chosen approach burdens substantially more speech than necessary.").

Just as in McCullen, there are numerous alternative measures Sandy City could have employed to address the risks associated with people falling off medians into traffic. For example, Sandy City "might have considered limiting activity on medians only at night, when the dark makes it more difficult for drivers to see." Cutting v. City of Portland, 802 F.3d 79, 92 (1st Cir. 2015). Sandy City also could have examined "pedestrian and vehicle traffic patterns" and limited the Ordinance to certain times of day when traffic is busiest or to certain areas where the speed limit is greatest. Id. at 88. Sandy City did not consider such limitations.

In addition to narrowing the Ordinance by time of day or pedestrian and vehicle traffic, Sandy City could have applied the Ordinance only to those medians which were the focus of the complaints the City received. See Aplee. App., Vol. II at 277–341. As discussed, most of the medians that were the subject of citizen complaints were within half a mile of each other and were near on- and off-ramps for Interstate Highway 15. The

9

City could have limited the Ordinance to medians in areas that had the most potential for safety problems.

Sandy City also could have used already-existing laws to ensure public safety. As in Cutting, the Sandy City citizen complaints showed that much of the "danger to drivers and other users of the streets . . . was tied to concerns about disruptive and inattentive individuals on median strips." 802 F.3d at 90. Specifically, citizens complained that panhandlers "appeared to be intoxicated or high" or "were having trouble walking[ and] keeping their balance." Aplt. App., Vol. II at 357. This behavior could "be addressed through existing local ordinances," McCullen, 573 U.S. at 492, including Sandy City's statutes against public intoxication and impeding traffic. Additionally, some medians can only be illegally accessed by jaywalking. By enforcing its laws prohibiting jaywalking, the City could reduce access to medians without burdening speech.

"The point is not that [Sandy City] must enact all or even any of the proposed [alternative approaches]. The point is instead that [the City] has available to it a variety of approaches that appear capable of serving its interests, without excluding individuals from areas historically open for speech and debate." McCullen, 573 U.S. at 493–94. The Ordinance is not unconstitutional merely "because there is some imaginable alternative that might be less burdensome on speech." Ward, 491 U.S. at 797. But, "[g]iven the vital First Amendment interests at stake, it is not enough for" Sandy City "to simply say that other approaches" would not work. McCullen, 573 U.S. at 496. Rather, the City must "show[] that it seriously undertook to address the problem with less intrusive tools readily available to it," id. at 494, and that these or other "alternative measures that

10

burden substantially less speech would fail to achieve" its interests, id. at 495. Sandy City has done neither, and that failure proves that the Ordinance is not narrowly tailored to achieve the City's interests.

The majority characterizes McCullen as "teaching" that "less restrictive means analysis might be helpful in the narrow tailoring inquiry." Maj. Op. at 17. McCullen's lesson is more affirmative than that: "[the City] must demonstrate that alternative measures that burden substantially less speech would fail to achieve [its] interests." McCullen, 573 U.S. at 495.

Instead, the majority does the work the City should have done, by concluding the "less restrictive means" are "clearly inadequate." Maj. Op. at 16–17 (quoting Ward, 491 U.S. at 800). But neither the majority, nor any court, is the proper body to perform this analysis or to reach this conclusion. Rather, to satisfy the requirement of McCullen, a governmental entity must perform this evaluation in the first instance. Any subsequent rationale a court may conjure up after the fact relieves the City of its burden and places it with the court. The City needed to evaluate alternatives so that it could demonstrate these alternatives failed to achieve its interests; and the record shows no such consideration. Under McCullen, dealing with a very similar statute, the Supreme Court required the government to show that alternatives like the ones presented here "failed to achieve [its] interests." McCullen, 573 U.S. at 495. Neither the district court nor the majority holds the City to that required standard.

11

E

In sum, the evidence the City relies on to show the requisite First Amendment means-end fit—the testimony of Johnson and Chapman that they did not feel safe on certain medians and the twenty-eight complaints about individuals in medians—is inadequate to support the City's decision to ban sitting or standing on all unpaved medians and all paved medians narrower than 36 inches throughout the entire city. And Sandy City has not shown that it attempted to address its safety concerns through other, less speech-restrictive alternatives. The City has not demonstrated that the Ordinance does not "burden substantially more speech than is necessary to further the government's legitimate interests," Ward, 491 U.S. at 799, nor has it shown that "alternative measures that burden substantially less speech would fail to achieve [its] interests," McCullen, 573 U.S. at 495. The Ordinance fails intermediate scrutiny.

II

Because I do not think the Ordinance survives intermediate scrutiny, I cannot merely assume, as the majority does, that the affected medians are traditional public fora. But I do not think that the City has established as a matter of law that the affected medians are nonpublic fora.[10] I would therefore reverse the district court's grant of summary judgment to the City and remand.

---

[10] Sandy City argues that "Evans has not provided any evidence that the unsafe medians at issue here are public forums." Aplee. Br. at 10. That argument misplaces the burden. "[W]hen a law infringes on the exercise of First Amendment rights," as the Ordinance does, "its proponent," here, Sandy City, "bears the burden of establishing its constitutionality." iMatter Utah v. Njord, 774 F.3d 1258, 1263 (10th Cir. 2014) (quotation omitted). Thus, the burden was not on Evans to show the affected medians are

12

We distinguish between traditional public, designated public, and nonpublic fora by looking at: (1) physical characteristics of the property, including location, see Frisby v. Schultz, 487 U.S. 474, 480–81 (1988); (2) intended use of the property, see United States v. Kokinda, 497 U.S. 720, 727 (1990); and (3) actual use of the property, see Ark. Educ. Telev. Comm'n v. Forbes, 523 U.S 666, 676 (1988). "[F]orum status is a fact-intensive inquiry," that "should be focused on the physical characteristics and the intended and actual use[s] of" the property. Verlo I, 820 F.3d at 1132, 1139.

As to the physical characteristics of the medians, the record has photos of "nearly every different type" of affected median. Aplt. Reply at 4. The photos reveal that, physically, the affected medians vary widely. For example, some contain park benches, memorial plaques, and signs readable only from close proximity, while others consist only of a narrow strip of concrete, likely only a few inches in length. Some medians are landscaped and accessible from crosswalks, while others are not.

As regards their intended uses, Sandy City claims "the sole purpose of the unsafe medians is to regulate automobile traffic, divide lanes, and prevent automobiles from crossing the centerlane in ways that would interrupt traffic flow." Aplee. Br. at 11. This may, in fact, be the City's intended use of the affected medians. But we have acknowledged that the government's intended use does not control the forum analysis. See First Unitarian Church of Salt Lake City v. Salt Lake City Corp., 308 F.3d 1114,

public fora subject to intermediate scrutiny, but on Sandy City to show either that the medians are nonpublic fora and the Ordinance survives rational basis review, or the Ordinance survives intermediate scrutiny.

13

1124–26 (10th Cir. 2002) ("We first reject the contention that the City's express intention not to create a public forum controls our analysis. The government cannot simply declare the First Amendment status of property regardless of its nature and its public use."). Further, the physical characteristics of some medians undercut the City's stated intent. For example, if some medians are park-like and have benches, "memorial trees," or "memorial plaques," those features might indicate that some of the affected medians are in fact intended for pedestrian use, including sitting or standing. Satawa v. Macomb Cty. Road Comm'n, 689 F.3d 506, 522 (6th Cir. 2012) ("[T]he record refutes the Board's contention that, because Mound Road is a high-volume roadway, the Board does not want people on the median. If this were so, it would be strange to provide access to the median via sidewalk, and to allow various groups to erect benches, a gazebo, and plaques that could only be read while standing on the median."). The City's own statement that the affected medians are "largely accessible only by jaywalking," Aplee. Br. at 11 (emphasis added), implies that at least some medians are accessible via crosswalk, which may also indicate that at those medians are intended for standing or sitting. See Satawa, 689 F.3d at 520 ("The median, moreover, invites visitors. It contains park benches and is accessible by sidewalk.").

Finally, regarding their actual uses, the record contains evidence that several medians have been used for protected speech activities. And the record indicates that Evans has used medians in Sandy City for speech activities on numerous occasions, both before and after the City enacted the Ordinance. The record therefore indicates that at least some of the affected medians have historically been used as public fora.

14

Because the record contains evidence that could support the conclusion that the affected medians are public fora, Sandy City has not established as a matter of law that the affected medians are nonpublic fora.

III

On the record presented, I would conclude that the Ordinance does not withstand intermediate scrutiny. Further, Sandy City has not established as a matter of law that the medians are nonpublic fora. I would reverse the district court's grant of summary judgment to the City and remand for further proceedings.

I respectfully dissent.